# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ADE ADENARIWO, *et al.*,

        *Plaintiffs*,

    v.

DISTRICT OF COLUMBIA,

        *Defendant*.

Civil Action No. 24-00856 (AHA)

## <u>Memorandum Opinion</u>

This is a second lawsuit Plaintiffs have filed against the District of Columbia, arising out of a public housing program that the District itself describes as "in many ways, a nightmare." ECF No. 15-1 at 1. The program, created to provide first-time, low-income homebuyers with affordable housing, instead left Plaintiffs with property that is unlivable. Plaintiffs filed a lawsuit against the District, property developers, and additional parties about alleged misrepresentations, negligence, breaches of contract and warranty, and other violations that left them in this situation. That lawsuit remains pending in D.C. Superior Court.

More recently, Plaintiffs filed this lawsuit, which is not about the development and sale of the defective property like their first suit, but challenges certain actions the District has taken since. According to Plaintiffs, certain things the District has done (or not done) since their first lawsuit violate the Constitution and D.C. tort and contract law. The District moves to dismiss this action, arguing that Plaintiffs have not asserted a cognizable constitutional violation and that their D.C. claims should be brought in Superior Court. The Court agrees and grants the motion.

I.    **Background**[1]

Many of the allegations in the complaint describe the acquisition, development, and sale of units at the property known as River East at Grandview Condominium in Southeast D.C., which is at issue in the pending D.C. Superior Court litigation and which the Court summarizes in brief for context. In 2013 and 2014, as part of an affordable housing program to assist low-income, first-time home buyers, the District took steps to develop Grandview. ECF No. 1 ¶¶ 19–25. This included selecting a general contractor, approving design and structure, and loaning funds to the general contractors to build affordable units at the property. *Id.*[2]

The program was designed such that part of the loan to the general contractors would be transferred to eventual homebuyers, on terms based on their proportionate share of the property. *Id.* ¶¶ 27–28. The terms of the development and sale agreements were structured such that the units would be sold to and then occupied exclusively by low-income residents for at least forty years. *Id.* ¶¶ 45–46. The District also created incentives for low-income homebuyers to participate, including that purchasers would have their District loan forgiven over a fifteen-year period as long as they lived in the property as their primary residence and met other conditions. *Id.* ¶¶ 41–42, 47.

Plaintiffs allege that throughout the inspection and permitting process, major problems surfaced, including with the property's retaining walls and foundations, and the District repeatedly failed to take appropriate action. *Id.* ¶¶ 51–52. In February 2017, the District instead issued a

---

[1]    As required at the pleading stage, the Court accepts the complaint's well-pled factual allegations and draws all reasonable inferences in Plaintiffs' favor. *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015).

[2]    According to the complaint, the District "selected Stanton View Development, LLC ('Stanton View') as the general contractor, and RiverEast at Anacostia, LLC ('RiverEast') subsequently became Stanton View's assignee or vice versa with respect to this Property." ECF No. 1 ¶ 19. The Court adopts the complaint's naming convention and refers to Stanton View and RiverEast as "the general contractors."

certificate of occupancy upon completion of the project. *Id.* ¶ 33. Plaintiffs and other purchasers bought the units in the two years that followed. *Id.* ¶¶ 34, 55. In addition to the District loan transferred to Plaintiffs with the purchase, Plaintiffs undertook private mortgages to cover the remainder of the purchase price and were approved as eligible purchasers under the District's Home Purchase Assistance Program. *Id.* ¶¶ 49–50. Upon moving into their units, Plaintiffs quickly experienced issues including backed-up sewage and broken plumbing; separation of ceilings, walls, and floors; rampant mold and mildew; and defective doors and windows. *Id.* ¶ 56.

After repeatedly raising these issues with both the District and the general contractors to no avail, Plaintiffs sued the District and the general contractors in D.C. Superior Court in January 2021 and later added other private parties as defendants. *Id.* ¶¶ 57–64 & n.1. Plaintiffs have asserted many claims in that action, including contract, tort, and consumer protection claims related to the development, sale, and failure to act in response to Plaintiffs' complaints. *Id.* ¶ 64 n.1; *see May v. River E. at Grandview*, 322 A.3d 557, 565, 574 (D.C. 2024). That lawsuit remains pending.

As Plaintiffs explain, this case is not about the conduct leading to the development and sale of fundamentally defective property, but challenges the District's conduct after. ECF No. 17 at 1, 39–40. In the months that followed Plaintiffs' Superior Court lawsuit, the District sent correction orders to the Grandview homeowners association outlining numerous code violations at the property and, at the District's direction, the homeowners association recommended that all residents evacuate. *Id.* ¶¶ 66, 72–73. Plaintiffs accordingly evacuated. *Id.* ¶ 74. Over the years that followed, the District and the homeowners association would conduct studies and identify further defects, and the District would propose repairs to stabilize and preserve the property that never happened. *Id.* ¶¶ 82–88.

In September 2023, the homeowners association received a report of an "Imminent Collapse Potential Hazard" at the property and, two days later, the District posted "DANGER" placards on residents' doors, stating:

> NO OCCUPANCY – STRUCTURAL DAMAGE: This structure, equipment and/or system is unsafe and its occupancy or use has been prohibited by the code official. It shall be unlawful for any person to enter the structure for any purpose other than to render it safe, or to operate any equipment or system until inspected and approved. Reference 12A DCMR §115-116, and 12G DCMR §108.

*Id.* ¶¶ 92, 94. The placards were removed for a brief period, but reposted a couple months later. *Id.* ¶¶ 95, 99–100. A few weeks after that, the District sent a memorandum to the property owners listing some of the units as unsafe to occupy, including those belonging to five Plaintiffs. *Id.* ¶¶ 103–04. Plaintiffs were given thirteen days to vacate the property and remove their belongings. *Id.* ¶ 105. For the other units, the District stated that it believed each unit was "more likely than not safe to occupy," but it recommended that "you retain a structural engineer to advise you on whether it is safe to permanently return to your unit." *Id.* ¶ 103. During this period, the District's chief building officer made contradictory statements that the property did not present an imminent danger of collapse, and the District did not formally condemn the property or its units. *Id.* ¶¶ 95, 102, 108.

Following these events, the District began negotiations with the property owners' private mortgage lenders and committed to releasing property owners from the public liens on their units once they reached an agreement. *Id.* ¶¶ 109–10. The District's conversations with private lenders caused the lenders to learn that Plaintiffs' units were vacant and to post notices on their doors, stating:

> IMPORTANT! We found this property to be vacant and/or abandoned. This information will be reported to the mortgage holder. The mortgage holder has the right to protect this property. The property may be rekeyed and/or winterized within 3 days.

*Id.* ¶¶ 113–14.

In March 2024, the District hosted an informational meeting for property owners, which was not open to the public or press. *Id.* ¶ 115. Plaintiffs' counsel attempted to join the meeting with her clients but was denied entry, even though other third parties who were not property owners were permitted to attend the meeting, along with general counsel for the District's Department of Housing and Community Development ("DHCD"). *Id.* ¶¶ 116–21. When Plaintiffs' counsel told a District representative that this constituted unlawful retaliation against Plaintiffs for obtaining counsel, the representative responded that "such statements *are the reason why* the District was barring Plaintiffs' counsel from the meeting." *Id.* ¶ 123. At the meeting, the District again committed to forgiving the owners' public loans, but it did not mention their private mortgage debts. *Id.* ¶ 124.

A few weeks later, Plaintiffs filed this action asserting that the District's post-sale conduct amounts to a taking and violation of due process under the Fifth Amendment and unlawful retaliation under the First Amendment. *Id.* ¶¶ 125–46. They also assert D.C. common law claims for negligent undertaking in reliance, negligence through a special relationship, and promissory estoppel. *Id.* ¶¶ 147–67. Defendants have moved to dismiss, arguing that the complaint fails to state a claim under Federal Rule of Civil Procedure 12(b)(6). ECF No. 15.

## II.    Discussion

To survive dismissal under Rule 12(b)(6), a complaint must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."

*Id.* (quoting *Twombly*, 550 U.S. at 556). "[A] well-pleaded complaint should be allowed to proceed 'even if it strikes a savvy judge that actual proof of [the alleged] facts is improbable, and that a recovery is very remote and unlikely.'" *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015) (second alteration in original) (quoting *Twombly*, 550 U.S. at 556).

### A.  Plaintiffs Fail To State A Takings Claim

The Constitution's Takings Clause prohibits private property from being "taken for public use, without just compensation." U.S. Const. amend. V. The Supreme Court has recognized that takings can occur in different ways.

The "paradigmatic" taking is "a direct government appropriation or physical invasion of private property." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005). That includes, for example, the government's seizure of a coal mine or occupation of a private warehouse. *Id.* (citing *United States v. Pewee Coal Co.*, 341 U.S. 114 (1951); *United States v. Gen. Motors Corp.*, 323 U.S. 373 (1945)). But there are also some circumstances where regulation is "so onerous that its effect is tantamount to a direct appropriation." *Id.* A *per se* regulatory taking occurs when regulations either cause the property owner "to suffer a permanent physical invasion of her property" or "completely deprive an owner of '*all* economically beneficial us[e]' of her property." *Id.* at 538 (alteration in original) (quoting *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1019 (1992)). In those circumstances, the government must pay just compensation unless "'background principles of nuisance and property law' independently restrict the owner's intended use of the property." *Id.* (citing *Lucas*, 505 U.S. at 1026–32). A regulatory taking can also be shown under the *Penn Central* test, which requires a court to evaluate the "economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations," as well as the "character of the governmental action." *Id.* at 538–39 (quoting *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978)). Plaintiffs

assert a physical taking, a *per se* regulatory taking based on deprivation of economically beneficial use, and a *Penn Central* taking occurred here, but those arguments are not viable.

First, Plaintiffs argue the District effected a physical taking because, after the District communicated with private lenders, the lenders learned Plaintiffs' properties had been vacated and posted notices stating that they could rekey the properties under the terms of Plaintiffs' mortgages. ECF No. 17 at 17–19; *see* ECF No. 1 ¶¶ 113–14. According to Plaintiffs, the District thus appropriated Plaintiffs' right to exclude for the benefit of the private lenders. ECF No. 17 at 19.

This theory is far afield from what the law recognizes as a physical taking. *See, e.g.*, *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 421 (1982) (holding that state law requiring landlords to permit cable companies to install cable facilities in apartment buildings effected a taking); *see also 767 Third Ave. Assocs. v. United States*, 48 F.3d 1575, 1583–84 (Fed. Cir. 1995) (concluding that "the government's actions did not rise to the level of a *per se Loretto*-type physical taking" where the government posted notices restricting access but did not physically occupy the premises or prevent plaintiff from entering); *Landi v. Mahoning Twp.*, No. 22-cv-1125, 2023 WL 5962093, at *7 (M.D. Pa. Sept. 13, 2023) ("Declaring a residence unfit for occupancy, and directing the owner to keep it vacant until repairs are made, does not amount to a physical taking."). And even if the chain of events here—the District talking to private lenders who took independent action—could suffice, it is hard to see how a posting that properties *could* be rekeyed constitutes a physical deprivation of property.

Plaintiffs' second theory is that the District's restrictions on inhabiting and transferring the property based on its unsafe condition, while also not taking action to repair the property, amount to a *per se* regulatory taking because they have deprived Plaintiffs of all economically beneficial use of the property. ECF No. 17 at 7. As the District points out, and Plaintiffs appear to accept, a

regulatory taking generally cannot be premised on government inaction. ECF No. 15-1 at 13–14 & n.6; *see, e.g.*, *St. Bernard Par. Gov't v. United States*, 887 F.3d 1354, 1360 (Fed. Cir. 2018) ("On a takings theory, the government cannot be liable for failure to act, but only for affirmative acts by the government."); *Bos. Taxi Owners Ass'n, Inc. v. City of Boston*, 84 F. Supp. 3d 72, 80 (D. Mass. 2015) ("[C]ourts have found that the government must act affirmatively to warrant the application of the Takings Clause."); *Martell v. City of St. Albans*, 441 F. Supp. 3d 6, 21–22 (D. Vt. 2020) (collecting cases).

The only affirmative action Plaintiffs identify is the District's posting of notices to vacate on Plaintiffs' property after it had been deemed unsafe. *See* ECF No. 17 at 8–9, 22–23. At the same time, Plaintiffs appear to concede that such notices cannot alone amount to a taking. *See id.* at 11 ("If the issue was only the District's temporary exclusion of Plaintiffs from their Properties while ensuring compliance through formal condemnation or repair, the discussion may be different."). They argue that the combination of issuing such notices *and* not repairing or formally condemning the property amounts to a regulatory taking because the District was under an affirmative obligation to take one of those actions. *See id.* at 8–11, 22–23.

Even assuming this could give rise to a regulatory taking, the problem is that the District was not under any affirmative duty to repair or condemn the property. Plaintiffs contend the Unsafe Structures Act assigns the District "an affirmative legal duty to ensure the habitability, safety, and sanitary condition of buildings in its jurisdiction." *Id.* at 9 & n.3 (citing D.C. Code §§ 6-801(d)(1), 6-803). That act says that when the District determines a structure is unsafe but not an imminent threat to public safety, "the Mayor shall immediately notify a responsible party and require the

responsible party to make the structure . . . safe." D.C. Code § 6-801(d)(1).[3] And if the responsible party fails to comply, "the Mayor may institute any authorized remedy or corrective action, at the owner's expense, or impose a penalty or initiate a proceeding." *Id.* § 6-801(d)(2). But the D.C. Court of Appeals has made clear that this language is permissive, not mandatory—the Unsafe Structures Act "does not grant building owners or any other private parties the right to obtain demolition permits upon a showing that their buildings are unsafe." *J.C. & Assocs. v. Bd. of Appeals & Rev.*, 778 A.2d 296, 308 (D.C. 2001). Instead, "the Act is purely a grant of enforcement authority to the Mayor to secure or demolish unsafe structures, or to compel their owners to do so, under specified conditions as the Mayor sees fit." *Id.* "The exercise of this enforcement authority is committed to executive discretion," and the mayor's decision "is not subject to judicial . . . oversight." *Id.* at 308–09; *see also id.* at 309 ("[N]othing in the Unsafe Structures Act entitles a private party to compel the Mayor to act if the Mayor is not of a mind to do so."). It is thus not accurate to say that the statute creates an affirmative duty for the District to act.[4]

Plaintiffs' argument that the notices to vacate and the District's building safety legislation amount to a taking also fails because these make up "longstanding background restrictions" on property rights under D.C. law. *See Cedar Point Nursery v. Hassid*, 594 U.S. 139, 160 (2021). The Supreme Court has made clear that "the government does not take a property interest when it merely asserts a 'pre-existing limitation upon the land owner's title.'" *Id.* (quoting *Lucas*, 505 U.S.

---

[3]    The statute defines "responsible party" as "the owner, agent, or other person having an interest in the structure." D.C. Code § 6-801(b)(1).

[4]    Even if the statute created an affirmative duty to act, it is not clear that would get Plaintiffs anywhere. Plaintiffs appear to assume that the statute would oblige the District to restore their property. But as noted, the act allows the District to "institute any authorized remedy or corrective action, at the owner's expense, or impose a penalty or initiate a proceeding." D.C. Code § 6-801(d)(2). Imposing a penalty against the responsible party, or taking corrective action such as demolition, would not restore Plaintiffs' units, and it is hard to see how failure to impose a penalty or demolish a building could be a taking.

at 1028–29). "For example, the government owes a landowner no compensation for requiring him to abate a nuisance on his property, because he never had a right to engage in the nuisance in the first place." *Id.* These "background limitations" also include "traditional common law privileges," such as the privilege allowing individuals to enter property based on public or private necessity. *Id.* at 160–61; *see also Lucas*, 505 U.S. at 1029 n.16 (noting litigation "absolving the State (or private parties) of liability for the destruction of 'real and personal property, in cases of actual necessity, to prevent the spreading of a fire' or to forestall other grave threats to the lives and property of others" (citation omitted)). The Takings Clause does not require just compensation where regulations "do no more than duplicate the result that could have been achieved in the courts." *Lucas*, 505 U.S. at 1029.

That's the case here. The Unsafe Structures Act is general safety legislation, whose regulations authorize the District to issue vacate notices to owners and residents of dangerous structures. *See* D.C. Code § 6-808 (allowing mayor to order use of unsafe buildings discontinued); D.C. Mun. Regs. tit. 12, § 115.3.1 (discussing access to premises where notice of unsafe condition posted). In ordering Plaintiffs to vacate, the District acted consistent with its background restrictions on property and did "no more than duplicate the result that could have been achieved in the courts." *Lucas*, 505 U.S. at 1029; *see also, e.g.*, *Devines v. Maier*, 728 F.2d 876, 886 (7th Cir. 1984) (holding that city's declaration that dwelling was uninhabitable and issuance of order to temporarily vacate was not a taking but rather a performance of the city's "regulatory duty to protect the health, safety, morals, and general welfare of the public"). Plaintiffs have accordingly failed to show a regulatory taking on the theory that the District deprived them of "all economically beneficial or productive use of land." *Lucas*, 505 U.S. at 1015.

Finally, Plaintiffs assert a regulatory taking under *Penn Central*, which applies where there is "[a]nything less than a 'complete elimination of value,' or a 'total loss.'" *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 330 (2002) (quoting *Lucas*, 505 U.S. at 1019–20 n.8); *see* ECF No. 17 at 19. But the outcome is the same under *Penn Central*. The District's regulation of the property was authorized by the Unsafe Structures Act and intended to promote public safety, while Plaintiffs have not identified any reasonable expectation of continuing to inhabit the property. *See Penn Cent.*, 438 U.S. at 124 ("A 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." (internal citation omitted)); *Berrios v. City of Lancaster*, 798 F. Supp. 1153, 1159 (E.D. Pa. 1992) (rejecting takings claim where defendants issued notice to vacate "as a municipal government exercising its police powers" and plaintiffs had no reasonable expectation of continued possession of uninhabitable properties). Indeed, some courts have concluded that, like *per se* regulatory takings, a *Penn Central* taking cannot be premised on longstanding background restrictions like those here. *See, e.g.*, *N. Nat. Gas Co. v. Approximately 9117 Acres in Pratt, Kingman, & Reno Cntys.*, No. 10-cv-1232, 2013 WL 3328773, at *11 n.10 (D. Kan. July 2, 2013) ("Although *Lucas* dealt with a categorical taking, as a matter of logic the same inquiry would be germane in the *Penn Central* taking analysis."); *cf. 1256 Hertel Ave. Assocs., LLC v. Calloway*, 761 F.3d 252, 265 (2d Cir. 2014) (addressing *Lucas* test and *Penn Central* factors together). The recharacterization of Plaintiffs' takings claim under *Penn Central* thus fails as well.

### B.  Plaintiffs Fail To State A Due Process Claim

Plaintiffs also assert that the District violated their procedural and substantive due process rights under the Fifth Amendment. ECF No. 1 ¶¶ 136–38; ECF No. 17 at 24–31. But the complaint does not state a viable due process claim under either theory.

"A procedural due process violation under the Fifth Amendment occurs when a government official deprives a person of property without appropriate procedural protections— protections that include, at minimum, the basic requirements of notice and an opportunity to be heard." *N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1265 (D.C. Cir. 2020). Plaintiffs contend that several actions alleged in the complaint deprived them of property without process, but none of them does.

First, Plaintiffs point to an August 2021 letter from their homeowners association, which they allege was sent "at the direction of the District." ECF No. 1 ¶ 73. But according to the complaint, this letter "recommend[ed] an evacuation of all residents and units within the building." *Id.* ¶ 72. Aside from a conclusory assertion that this action "deprived Plaintiffs of both pre- and post-deprivation process," Plaintiffs do not explain how a recommendation to evacuate, even if coming from the District, rises to the level of a deprivation of property without process. ECF No. 17 at 26.

Second, Plaintiffs refer to the District's placards to vacate the property and the follow-up memorandum that listed some of the units as unsafe to occupy. *Id.* at 26–27. Plaintiffs argue that these were issued "without providing pre-deprivation notice or process" and did not "fairly advise Plaintiffs of any sufficient post-deprivation process." *Id.* at 26; *see* ECF No. 1 ¶¶ 94–105. As explained, however, the District's notices to vacate upon deeming the property unsafe enforced background restrictions on the property. Moreover, Plaintiffs had available remedies to challenge the notices to vacate. Plaintiffs could have appealed the notices. *See* D.C. Mun. Regs. tit. 12,

§ 112.2 (providing for appeal to Office of Administrative Hearings for any person "directly affected or aggrieved in a materially adverse manner by a final decision or order of the code official" (emphasis omitted)); *see also 3883 Conn. LLC v. District of Columbia*, 336 F.3d 1068, 1074 (D.C. Cir. 2003) (recognizing the District's "significant interest in maintaining its capability to act swiftly to bring an immediate halt to construction work that poses a threat to public health and safety or to the environment" and concluding that regulations providing for post-deprivation review satisfied due process). Plaintiffs appear not to dispute that they never pursued these remedies, and therefore they cannot state a due process claim. *See, e.g.*, *Chavis v. Garrett*, 419 F. Supp. 3d 24, 38 (D.D.C. 2019) ("Because [the plaintiff] has not alleged that she availed herself of available procedures under District of Columbia law, she cannot plausibly state a claim under § 1983 for violation of her due process rights.").[5]

Third, Plaintiffs say the District violated their due process rights by communicating with their private lenders and disclosing that Plaintiffs had vacated the property, causing the lenders to issue notices that they might rekey the properties. ECF No. 17 at 27–28. But Plaintiffs do not suggest that the District directed the lenders to issue the notices or that the lenders acted on the District's behalf in doing so.

Plaintiffs have not stated a violation of substantive due process either. Substantive due process "constrains only egregious government misconduct." *Elkins v. District of Columbia*, 690 F.3d 554, 561–62 (D.C. Cir. 2012) (quoting *George Washington Univ. v. District of Columbia*,

---

[5]  Plaintiffs argue that the placards "failed to explicitly advise Plaintiffs of their right to appeal, as required by DCMR 12G § 106.9.4(7)." ECF No. 17 at 27. But Plaintiffs do not explain how that alleged failure rises to the level of a due process violation, particularly given that the placards identified the action being taken, the actor responsible for the determination, and the relevant legal authority. ECF No. 1 ¶¶ 94, 99; *cf. City of West Covina v. Perkins*, 525 U.S. 234, 241 (1999) (declining to require individualized notice of state law remedies that were "established by published, generally available state statutes and case law").

318 F.3d 203, 209 (D.C. Cir. 2003)). To state this claim, a plaintiff "'must at least show that state officials are guilty of grave unfairness,' which requires demonstrating either 'a substantial infringement of state law prompted by personal or group animus, or a deliberate flouting of the law that trammels significant personal or property rights.'" *Id.* at 562 (quoting *Silverman v. Barry*, 845 F.2d 1072, 1080 (D.C. Cir. 1988)). "By contrast, '[i]nadvertent errors, honest mistakes, agency confusion, even negligence in the performance of official duties, do not warrant redress.'" *Id.* (alteration in original) (quoting *Silverman*, 845 F.2d at 1080).

The allegations here do not satisfy this demanding standard. Plaintiffs do not argue that the District's alleged conduct could be characterized as "prompted by personal or group animus," and to the extent Plaintiffs assert "a deliberate flouting of the law," it is simply through conclusory statements their merits arguments are correct. *See* ECF No. 17 at 30–31 (claiming that the District has substantially restricted Plaintiffs' property rights and refused to repair or condemn the property, while also retaliating against Plaintiffs for pursuing legal action). At best, Plaintiffs contend the District has not followed D.C. law requiring a formal condemnation or repairs to an unsafe building. But even if Plaintiffs' reading of the relevant statutes and regulations were correct, "a breach of local law does not of itself violate substantive due process." *George Washington Univ.*, 318 F.3d at 210. Plaintiffs provide no allegations from which the Court could plausibly infer that the District deliberately flouted law or that its actions "in their totality are genuinely drastic." *See Tri Cnty. Indus., Inc. v. District of Columbia*, 104 F.3d 455, 459–60 (D.C. Cir. 1997) (rejecting substantive due process claim where plaintiff failed to pursue available remedy under D.C. regulation allowing for appeal of agency action). Plaintiffs accordingly have failed to state a substantive due process claim.

**C.  Plaintiffs Fail To State A First Amendment Retaliation Claim**

Plaintiffs assert that the District violated the First Amendment by excluding their counsel from the March 2024 informational meeting for property owners. According to Plaintiffs, this was unlawful retaliation against them for filing their Superior Court lawsuit. ECF No. 1 ¶¶ 139–46.

To state a claim, Plaintiffs must plausibly allege "(1) that [they] engaged in protected conduct, (2) that the government took some retaliatory action sufficient to deter a person of ordinary firmness in [their] position from speaking again, and (3) that there exists a causal link between the exercise of a constitutional right and the adverse action taken against [them]." *Scahill v. District of Columbia*, 909 F.3d 1177, 1185 (D.C. Cir. 2018) (internal quotation marks and citation omitted). Here, it is undisputed that the filing of the state court action is protected conduct, satisfying the first requirement.

But even assuming that the exclusion of counsel from a meeting would be sufficient to deter a person from filing suit in the future, Plaintiffs' claim fails to plausibly allege the third element—that the exclusion of counsel was causally linked to Plaintiffs' filing of the Superior Court lawsuit. The complaint does not allege that there was any statement or policy of excluding attorneys for those who had filed suit and does not allege specific facts from which that can be plausibly inferred. For instance, the complaint does not allege that any other property owners who did not join the state court action were permitted to have legal representatives attend the meeting. Plaintiffs instead speculate that the "*only* reason to exclude Plaintiffs' counsel was to retaliate for her clients' exercise of First Amendment rights," but this conclusory assertion does not provide the necessary factual support to show a causal link between the retaliatory action and the protected conduct. ECF No. 17 at 33.

The closest the complaint comes to alleging causation is in its description of an altercation between Plaintiffs' counsel and a District representative after Plaintiffs' counsel was told that she

could not join the meeting. In that description, *Plaintiffs' counsel* asserted that "prohibiting her presence in the meeting with and on behalf of her clients was an unlawful retaliation against Plaintiffs for obtaining counsel to rightfully petition on their behalf." ECF No. 1 ¶ 123. And the District representative countered that "such statements *are the reason why* the District was barring Plaintiffs' counsel from the meeting." *Id.* While the representative's statement certainly reinforces the preference to not have counsel present in the meeting, it does not support the inference that counsel was excluded because Plaintiffs filed a lawsuit, the protected activity asserted. Indeed, the complaint alleges that the meeting had been closed to the public well before the representative made this alleged remark to counsel. *Id.* ¶¶ 115, 117.[6]

The complaint accordingly fails to state a First Amendment retaliation claim.[7]

## III.    Conclusion

For these reasons, Plaintiffs' complaint in this Court fails to state a cognizable constitutional claim. Although the complaint also asserts additional claims under D.C. law, the Court declines to exercise supplemental jurisdiction over them. The D.C. Circuit has explained

---

[6]    Although the Court need not reach the issue, it is for similar reasons doubtful that Plaintiffs satisfy the second element of a First Amendment retaliation claim—that excluding Plaintiffs' counsel from the informational meeting would deter a person of ordinary firmness from filing a lawsuit in the future. There is no allegation that Plaintiffs themselves were excluded from the meeting, or that their filing a lawsuit contributed to the decision to exclude their counsel.

Moreover, because the Court concludes Plaintiffs have not sufficiently alleged a constitutional violation, it need not reach the District's argument that they have also failed to allege municipal liability. *See* ECF No. 15-1 at 32–33.

[7]    Plaintiffs' briefing also argues the District violated the unconstitutional conditions doctrine. ECF No. 17 at 35–36. This theory is not included in the complaint, but is in any event inapposite. The unconstitutional conditions doctrine provides that the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests." *Autor v. Pritzker*, 740 F.3d 176, 181 (D.C. Cir. 2014) (quoting *Perry v. Sindermann*, 408 U.S. 593, 597 (1972)). Plaintiffs do not identify any benefit they were denied; indeed, they argue the meeting in question "outlined various benefits" that were being offered. ECF No. 17 at 35. And to the extent Plaintiffs suggest that the meeting itself was a benefit, Plaintiffs were allowed to attend the meeting.

that "[i]n the usual case in which all federal-law claims are dismissed before trial, the balance of factors to be considered under the pendent jurisdiction doctrine . . . will point toward declining to exercise jurisdiction over the remaining state-law claims." *Araya v. JPMorgan Chase Bank, N.A.*, 775 F.3d 409, 417 (D.C. Cir. 2014) (alteration and omission in original) (quoting *Shekoyan v. Sibley Int'l*, 409 F.3d 414, 424 (D.C. Cir. 2005)). The Court finds that "the values of judicial economy, convenience, fairness, and comity" favor any such claims being asserted in D.C. Superior Court, where Plaintiffs' original litigation remains pending. *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988). Indeed, Plaintiffs have not argued for this Court to retain jurisdiction in the event all federal claims are dismissed. *See also, e.g.*, *Elshazli v. District of Columbia*, 415 F. Supp. 3d 20, 29 (D.D.C. 2019) (declining to exercise supplemental jurisdiction where parties had not invested resources in discovery and case presented local issue of D.C. common law "that would be better resolved by local jurists"); *Deppner v. Spectrum Health Care Res., Inc.*, 325 F. Supp. 3d 176, 191 (D.D.C. 2018) (same where case had not progressed beyond first motion to dismiss and court had not developed any familiarity with state law claims).[8]

Accordingly, the District's motion to dismiss, ECF No. 15, is granted and this action is dismissed without prejudice.[9]

---

[8] Defendants argue that this Court lacks jurisdiction over Plaintiffs' state law claims to the extent they could have been asserted in the Superior Court action and that the claims fail on the merits. ECF No. 15-1 at 35–45. Because the Court declines to exercise jurisdiction over the state law claims, it does not address these alternative arguments.

[9] Plaintiffs' opposition brief ends with a request for leave to amend their complaint. ECF No. 17 at 45. However, a "bare request in an opposition to a motion to dismiss—without any indication of the particular grounds on which amendment is sought—does not constitute a motion within the contemplation of Rule 15(a)." *Rollins v. Wackenhut Servs., Inc.*, 703 F.3d 122, 130 (D.C. Cir. 2012) (quoting *Belizan v. Hershon*, 434 F.3d 579, 582 (D.C. Cir. 2006)). Any such request would need to account for Plaintiffs' decision not to seek leave to amend when asked by the Court after the completion of briefing. *See* ECF No. 24 at 4 ("Plaintiffs do not intend to seek leave to amend their Complaint at this time but reserve their right to do so in the future.").

A separate order accompanies this memorandum opinion.

_____

AMIR H. ALI
United States District Judge

Date:   April 24, 2025